James L. BROWN, Appellant,

v.

UNITED STATES, Appellee.

No. 84–93.

District of Columbia Court of Appeals.

Argued Jan. 13, 1986.
Decided Nov. 19, 1986.

---

Neil H. Jaffee, Washington, D.C., appointed by the court, for appellant.

Kenneth J. Melilli, Asst. U.S. Atty., with whom Joseph E. diGenova, U.S. Atty., and Michael W. Farrell, Judith Hetherton, and Diane G. Clarke, Asst. U.S. Attys., Washington, D.C., were on brief, for appellee.

Before PRYOR, Chief Judge, and FERREN and ROGERS, Associate Judges.

FERREN, Associate Judge:

Appellant was convicted of armed robbery, D.C. §§ 22–2901, –3202 (1981), and carrying a pistol without a license, *id.* § 22–3204. The trial court sentenced him to concurrent prison terms of 15 to 45 years and of one to three years, the latter being an enhanced sentence for the pistol offense because of prior convictions. Appellant contends the trial court erred in denying his motion to suppress a lineup identification, as well as his statements to the police and to the grand jury. He as-

serts the government obtained this evidence in violation of his right to appointment of counsel to help assure grand jury compliance with the "minimal factual showing" required for a lineup directive under our decision in *In re Kelley,* 433 A.2d 704, 707 (D.C.1981) (en banc). Appellant also asks for reversal based on ineffectiveness of trial counsel.

We conclude the government has a responsibility, and failed, to advise appellant of his *Kelley* rights so that he would have known he could contest the lineup directive. Under the circumstances, however, that failure was not prejudicial. Moreover, we do not agree that the sixth amendment or *Kelley* entitles the recipient of a grand jury lineup directive to appointment of counsel. Finally, we conclude that trial counsel was not constitutionally ineffective. Accordingly, we affirm.

### I.

On January 1, 1981, at approximately 1:45 a.m., Willie Davis was driving home from a club. As Davis paused at a stop sign at the intersection of Wheeler Road and Varney Street, S.E., appellant, who was carrying a pistol, approached and robbed him. Davis gave appellant a twenty dollar bill and his wallet. As appellant retreated to the rear of Davis' car to examine the wallet, Davis heard a shot and saw appellant hunched over in pain holding his hand, apparently having shot himself accidentally. Davis reported the robbery to the police. Although it was a dark, snowy evening, Davis was able to get a good look at appellant's face.

Later that morning, at 3:42 a.m., appellant entered Greater Southeast Community Hospital claiming he had been shot in the hand at approximately 1:30 a.m. Appellant was the only person treated for a gunshot wound at Greater Southeast, or at three other nearby hospitals, between midnight and 8:00 a.m. on January 1, 1981. While at the hospital, appellant told a police officer that he had been shot while being robbed, that he had gone home before coming to the hospital, and that he did not want the police involved in the robbery.

Having learned of appellant's statement at the hospital, Detective Willie Jefferson showed Davis a photo array consisting of nine photographs, including a nine-year-old photograph of appellant. Davis selected appellant's picture but was only able to make a "probable" identification. The government then subpoenaed appellant to appear before the grand jury to receive a directive ordering him to stand in a lineup.

When appellant appeared before the grand jury for the limited purpose of receiving the lineup directive, he volunteered both to Detective Jefferson and to the grand jury the same exculpatory claim he had made to the police officer at the hospital: that he had been shot in the hand while being robbed. Appellant indicated to Jefferson that this robbery had occurred at Varney Street and Wheeler Road, the same location at which Davis claimed appellant had robbed him.

The grand jury issued the directive. On January 28, 1981, Davis viewed the lineup and unequivocally identified appellant as the man who had robbed him earlier that month. (Later, Davis made a "positive" in-court identification of appellant.) Appellant did not have his own counsel at the lineup, but an attorney from the Public Defender Service stood in as appellant's counsel.

Detective Jefferson then obtained a warrant for appellant's arrest; the warrant was executed on February 7, 1981. Appellant was advised of, and expressly waived, his rights under *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). Appellant then told Jefferson—in contrast with his earlier statements—that shortly after midnight at a party on New Year's Day he had been shot accidentally while fighting with his brother in the presence of his brother's girlfriend. He added that the bullet was lodged in the floor of his apartment where Jefferson could retrieve it. When Jefferson told appellant that the bullet could be analyzed to deter-

mine whether it had passed through his hand, appellant changed his mind and directed Jefferson not to retrieve the bullet.

## II.

Appellant complains that when he "was served with a grand jury subpoena he was not advised that he had the right to consult with counsel out of the presence of the grand jury." He also complains that when he was later served with the lineup directive he was neither advised of his right under *Kelley* "to challenge the directive by refusing to attend the lineup" nor informed of his "right to counsel to represent him throughout the identification procedure." Because he was not so advised and did not have counsel, appellant contends, the lineup identification should have been suppressed.

Appellant also argues that, as a consequence of not having counsel, he failed to assert his fifth amendment right to remain silent. Thus, the trial court, he says, should have suppressed his uncounseled statements to the police and to the grand jury at the time he appeared to receive the lineup directive. Appellant, however, never asked the trial court to suppress these statements. Nor has he shown he was unaware of the grounds for such a motion or otherwise lacked the opportunity to file one. Accordingly, he may not raise this issue on appeal. D.C.Code § 23–104(a)(2) (1981); Super.Ct.Crim.R. 12(b)(3); *York v. District of Columbia*, 407 A.2d 695, 697 (D.C.1979). The only questions before us, therefore, pertain to the lineup.

## A.

Our en banc decision in *Kelley* focused on the implications of the government's "pass-through" technique. This phrase refers to the practice of passing police requests for a lineup through the grand jury, rather than requesting a court for a lineup order based on the "reasonableness" test announced in *Wise v. Murphy*, 275 A.2d 205 (D.C.1971) (en banc). In *Kelley*, appellant had refused to comply with a grand jury lineup directive; the government went to court to enforce it. Because of a lineup's significant intrusion on one's reasonable expectation of privacy, we held, based on our supervisory power over the grand jury, that a prosecutor who seeks judicial enforcement of a lineup directive must, "by affidavit of [a] law enforcement officer or a formal representation of an Assistant United States Attorney, make a minimal factual showing sufficient to permit the judge to conclude that there is a reason for the lineup which is consistent with the legitimate function of the grand jury." 433 A.2d at 707.

We premised our ruling in *Kelley* on our concern for "avoiding the appearance of, or the potential for, abuse of the grand jury system which may result from a commingling of the separate responsibilities of grand jury, prosecutor, and judge." *Id.* We therefore conclude a "minimal factual showing" for a lineup directive is necessary "to insure that the prosecutor and the grand jury are acting in good faith and not arbitrarily or to harass putative defendants." *Id.*

## B.

Appellant argues, first, that for this right to a "minimal factual showing" to have any practical significance, the recipient of a grand jury lineup directive must have the correlative right to be advised that the directive is contestable in court before the lineup takes place. Otherwise, he says, the likelihood of awareness, let alone assertion, of *Kelley* rights will be minimal; the intrusion will typically be accomplished without regard to the legitimacy of the lineup directive itself.

In the trial court, appellant did not articulate this advice-of-rights argument separately; he argued only for the right to appointed counsel, who would supply the *Kelley* advice. We do not believe, however, that appellant's decision to merge the two issues precludes our considering them separately on appeal. Conceptually, the

advice-of-rights issue and the alleged right to counsel, while separable, are closely related. Of considerable importance here, moreover, separate consideration of the advice-of-rights issue has a substantial bearing on whether we should exercise our supervisory authority to order appointment of counsel to assist a suspect served with a lineup directive. Accordingly, we deem the advice-of-rights issue, as such, properly before us.

To put the issue in perspective, we note that when a suspect is subpoenaed to testify before a grand jury and is considered a "target" or a "subject" of investigation, the prosecutor, as a matter of Department of Justice policy, appends to the subpoena a written "Advice of Rights" form.[1] In contrast, although the recipient of a lineup directive is by definition a "subject," if not a "target," *supra* note 1, the government associates a lineup directive with other grand jury directives that do not implicate constitutional rights and thus are not embraced by its "warnings" policy. *See, e.g., United States v. Dionisio,* 410 U.S. 1, 93 S.Ct. 764, 35 L.Ed.2d 67 (1973) (directive to make voice recording does not violate fourth or fifth amendment); *United States v. Mara,* 410 U.S. 19, 93 S.Ct. 774, 35 L.Ed.2d 99 (1973) (directive ordering hand-writing exemplar does not violate fourth amendment).

In *Kelley,* we rejected the government's association of a lineup directive with directives ordering voice recordings and handwriting exemplars. We characterized lineups as much more intrusive, with "considerably more risk of mistake and misidentification than the more scientifically grounded ... techniques involved in *Dionisio* and *Mara." Kelley,* 433 A.2d at 706. Therefore, although we did not premise *Kelley* on the fourth or fifth amendment, preferring to invoke our supervisory power without reaching constitutional questions, we nonetheless confirmed a right—derived from the "minimal factual showing" requirement imposed on the grand jury—that must be taken seriously and be capable of enforcement on a nondiscriminatory basis, when someone is subpoenaed to receive a lineup directive.

█ It follows from *Kelley* that no one may be subpoenaed to appear before the grand jury to receive a lineup directive without being informed about *Kelley* rights, just as a witness subpoenaed to testify is advised about fifth amendment rights. *Supra* note 1. The intrusiveness of a lineup puts *Kelley* rights alongside

---

1. According to a supplemental memorandum filed by the government, the "Advice of Rights" form provides the following "warnings":

    A. The grand jury is conducting an investigation of possible violations of specific criminal laws.

    B. The witness may refuse to answer any question if a truthful answer to the question would tend to incriminate him/her.

    C. Anything that the witness says may be used against him/her by the grand jury or in a subsequent legal proceeding.

    D. If the witness has retained counsel, the grand jury will permit him/her a reasonable opportunity to step outside the grand jury room to consult with counsel if the witness desires.

In addition, the prosecutor gives these "warnings" on the record before the grand jury and asks the witness to affirm that he or she understands them.

The government's memorandum explains who is entitled to these warnings. "A 'target' is a person as to whom the prosecutor or the grand jury has substantial evidence linking him/her to the commission of a crime and who, in the judgment of the prosecutor, is a putative defendant. A 'subject' of an investigation is a person whose conduct is within the scope of the grand jury's investigation."

The government's approach accords with our decision in *United States v. Washington,* 328 A.2d 98 (D.C.1974), *cert. denied,* 426 U.S. 905, 96 S.Ct. 2224, 48 L.Ed.2d 829 (1976). There, we stated, with respect to a witness subpoenaed to testify before a grand jury that " '[I]f the prosecutor believes that a witness is a potential defendant, he [or she] should not seek to compel his [or her] testimony before the grand jury without informing him [or her] that he [or she] may be charged and that he [or she] should seek independent legal advice concerning his [or her] rights.' " *Id.* at 100 (quoting ABA Project on Standards for Criminal Justice, The Prosecution Function, Standard 3.6(d) (1971). Except for stylistic alterations, Standard 3.6(d) remains unchanged in the 1980 edition. ABA, STANDARDS FOR CRIMINAL JUSTICE § 3–3.6(d) (2d ed. 1980).

constitutional rights for purposes of drawing the line between grand jury directives that require an advice of rights and those that do not. We agree with appellant that, absent such advice, a person not conversant with the criminal law of this jurisdiction is not likely to know about *Kelley*'s protection and thus has a right, clearly implied by *Kelley* itself, to be told about that protection.

Specifically, therefore, the government must develop an "advice of rights" form (similar to the one used when a "target" or a "subject" is subpoenaed to testify) essentially covering the following points:

    A. The grand jury is conducting an investigation of possible violation of specific criminal laws.

    B. Under appropriate circumstances the grand jury lawfully may issue a directive ordering a person to appear in a lineup.

    C. The results of a lineup may be used, in a subsequent legal proceeding, for or against anyone who appears in the lineup.

    D. Anyone who receives a subpoena to appear before the grand jury to receive a lineup directive has a right to consult with a lawyer before reporting to the grand jury and before complying with the directive, and also has the right to challenge the directive in court.

This form shall be appended to the subpoena. In addition, the prosecutor shall repeat these statements on the record before the grand jury and ask the suspect to affirm that he or she understands them.

Although the government failed to advise appellant of his *Kelley* rights, this is not to say there was sufficient prejudice to require reversal—an issue we defer until we have considered appellant's second, related contention.

### C.

We turn to appellant's asserted right to *counsel*. Appellant argues clearly enough that the government unlawfully failed to advise him of his right to *consult* with counsel upon receipt of the subpoena and again upon service of the lineup directive. He does not, however, clearly articulate the point in the process when he believes he had the right, in addition, to *appointment* of counsel if he could not provide his own. Fairly interpreted, however, we believe appellant is asserting the right, if indigent, to receive appointed counsel immediately after service of the lineup directive. We proceed on that premise.

### (1)

Appellant relies initially on the Constitution. In *Moore v. Illinois*, 434 U.S. 220, 98 S.Ct. 458, 54 L.Ed.2d 424 (1977), the Supreme Court held that a complaining witness' identification of the defendant at a preliminary hearing violated the sixth amendment because the defendant "was not represented by counsel ... and the court did not offer to appoint counsel." *Id.* at 223, 98 S.Ct. at 462. The Court premised its ruling on its analysis in *Kirby v. Illinois*, 406 U.S. 682, 92 S.Ct. 1877, 32 L.Ed.2d 411 (1972), where the Court had refused to order suppression of the identification of an uncounseled defendant at a showup after arrest, since there had not been a "formal charge, preliminary hearing, indictment, information, or arraignment." *Id.* at 689, 92 S.Ct. at 1882. The Court held in *Kirby* that the sixth amendment right to counsel attaches only when the "government has committed itself to prosecute," *id.*, that is, "only at or after the time that adversary judicial proceedings have been initiated against him." *Id.* at 688, 92 S.Ct. at 1881. Because the uncounseled defendant in *Moore* was identified at a preliminary hearing, when the government obviously had committed itself to prosecute, *Kirby*'s test for the right to counsel was satisfied.

The present case, however, is akin to *Kirby*, not to *Moore*. In seeking a grand jury lineup directive, the government was still in the process of investigation. It had not yet "committed itself to prosecute" appellant, who had not been arrested or

charged with any offense. *Kirby*, 406 U.S. at 689, 92 S.Ct. at 1887. Thus, appellant's sixth amendment right to counsel had not yet attached.

(2)

Alternatively, appellant stresses our supervisory power over the grand jury, arguing that the right to appointment of counsel in connection with a lineup directive is just as inherent in *Kelley* as the right to be advised of rights. Otherwise, he says, timely disclosure of *Kelley* rights will be meaningful only for those who have the financial resources to employ counsel to help them assert those rights.

The government replies that the exercise of our supervisory power in *Kelley* was limited to our traditional authority to enforce (or quash) grand jury orders, and that such authority does not extend to imposing "a rule upon the conduct of the grand jury itself" that would condition issuance of a lineup directive upon appointment of counsel for the suspect. The government further argues that, even assuming we have supervisory authority to establish such a right to appointed counsel, we should not do so. According to the government, such a ruling would unduly intrude "upon the independent proceedings of the grand jury"; it would enhance "a nonconstitutional right, while frequently no such requirement is in place to safeguard even constitutional rights"; it would probably result in a burdensome "proliferation of frivolous challenges to substantially all grand jury lineup directives"; and it "would open up a 'Pandora's Box' in that virtually every" grand jury witness called to "give testimony or other evidence" presumably would have the same right.

We agree with the government to this extent: even if a suspect subpoenaed to receive a lineup directive has a nonconstitutional right, derived from *Kelley*, to be advised that the grand jury must have a legitimate purpose for the directive, that the suspect may wish to consult with counsel before complying with it, and that the directive may be challenged in court, this does not necessarily mean that the suspect, if indigent, should also have the right to appointment of counsel upon receipt of the directive.

Fundamentally, *Kelley* accords the right to test the legitimacy of the lineup directive. This right may be preserved in two ways: (1) by permitting a suspect to contest the directive in court before the lineup takes place; and (2) by permitting a suspect who does not do so, and who eventually is prosecuted, to assert the absence of a legitimate basis for the lineup through a pretrial motion to suppress the identification—just as a defendant is entitled to do if the lineup itself was held without counsel. *See United States v. Wade*, 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967); *Gilbert v. California*, 388 U.S. 263, 87 S.Ct. 1951, 18 L.Ed.2d 1178 (1967).

■ The first alternative, directly reflecting *Kelley*, may be implemented either by filing a motion to quash the directive or by refusing to appear in the lineup and forcing the government to seek a court order. We announce the second alternative as a way of assuring that a suspect who does not challenge the lineup before it is held will nonetheless have the right, once he or she has appointed counsel, *see Moore*, to seek suppression based on *Kelley*. This second alternative makes clear, therefore, that the failure to contest the directive before the lineup is held does not moot the *Kelley* issue.

■ We recognize this approach does not guarantee that every suspect will have legal assistance to invoke *Kelley*'s second important protection: the right to prevent, if possible, an unlawful lineup itself, with a view to avoiding not only an unwarranted intrusion but also an identification that might be indispensable to an indictment. Nonetheless, we are not persuaded to go further. The recipient of a subpoena and resulting lineup directive will have learned from the advice-of-rights form—repeated and if necessary explained on the record when the suspect appears before the grand

jury—that the directive is not automatically valid, that it may be contested in court, and that consultation with a lawyer before appearing in the lineup may be useful. Even if counsel is not appointed, therefore, every suspect will have sufficient indication that he or she may be able to force the matter into court, before the lineup takes place, either by retaining counsel or simply by refusing to appear.

We believe this approach provides sufficiently equal treatment and is all *Kelley* demands. The "minimal factual showing" required by *Kelley*, coupled with the right eventually to test the basis for the lineup directive through a motion to suppress if the suspect is indicted, provides a significant inducement for the prosecutor and the grand jury to act lawfully. We are not persuaded that the risk of an unwarranted intrusion is sufficiently great to burden the government with an additional obligation to provide appointed counsel in every case of a subpoena for a lineup directive, before the government has committed itself to prosecute. Absent a showing that prosecutors and grand juries commonly abuse the lineup directive process, we do not believe the right to challenge the lawfulness of a lineup before, rather than after, it takes place is significant enough to justify that commitment of resources.

If a suspect chooses to comply with a grand jury lineup directive, whether out of a spirit of cooperation or out of apprehension and/or the unavailability of counsel, it is clear that the right to test the directive later, with the help of a lawyer, will not have been waived if the suspect is indicted. That, ultimately, is the critical right under *Kelley* for which the assistance of counsel must be, and now is, guaranteed.

### D.

■ We turn, finally, to the question whether the government's failure to advise appellant of his *Kelley* rights was prejudicial. We conclude that, even if appellant had timely received the advice of rights we now prescribe—indeed, even if appellant had received appointed counsel upon service of the lineup directive—the trial court would not have barred the lineup. Thus, there was no causal connection between appellant's unawareness of *Kelley* and the lineup identification he seeks to suppress.

If appellant had been told about *Kelley* and/or had received counsel, he might have refused to comply with the lineup directive and put the government to its burden of making the minimal showing required by *Kelley*. But, given complaining witness Davis' earlier, "probable" identification of appellant from the photo spread, as well as the other circumstantial evidence before the grand jury tending to show appellant's guilt,[2] the government unquestionably would have been able to make the "minimum factual showing" under *Kelley*. Furthermore, appellant had stand-in counsel from the Public Defender Service at the lineup itself, *see Shelton v. United States*, 388 A.2d 859 (D.C.1978), and the trial court, after viewing the videotape of the lineup, concluded the lineup was properly conducted.

In short, even if appellant had been advised of his *Kelley* rights and counsel had been appointed upon issuance of the lineup directive, appellant still could not have prevented the occurrence of the lineup or its result. Accordingly, appellant suffered no prejudice warranting suppression of the lineup identification.

### III.

■ Appellant also claims he did not receive effective assistance of counsel at trial. Specifically, he asserts that his trial counsel failed adequately to supervise the defense investigator and did not keep appellant advised of the investigation; that

---

**2.** Davis had told Detective Jefferson that the robber had accidentally shot himself in the hand. Jefferson later learned that appellant had been treated for a gunshot wound in the hand at a local hospital and was the only person treated for such a wound on the night in question in any of the four area hospitals.

counsel failed adequately to develop appellant's alibi defense; that counsel failed to obtain during discovery the substance of appellant's statements; and that counsel failed to object to allegedly improper cross-examination by the prosecutor.

Appellant's first contention is meritless because he has provided no record support for his assertion that trial counsel failed to supervise the defense investigator in his efforts to recover the bullet from the floor of appellant's apartment. Moreover, appellant's brother, William Brown, testified that a defense investigator had come to the apartment after appellant's arrest to remove a bullet from the floor and had taken something from the floor.

Appellant also has failed to provide record support for his assertion that counsel inadequately developed the alibi defense. In the first place, a defense witness, Marcus Bruce, did testify that appellant had been at a party at his own apartment between midnight and 2:00 or 2:20 a.m. Furthermore, counsel's decision to proceed to trial without the alibi testimony of Donna Nelson, appellant's girlfriend, was a reasonable tactical choice. Her testimony not only would have been cumulative but also would have undercut appellant's defense because of major inconsistencies between her proposed testimony and that of other witnesses.

Nor do we find merit to appellant's claim that counsel failed to obtain discovery of appellant's oral statements. The record makes clear that counsel diligently pursued discovery of appellant's statements and, in fact, did obtain the substance of those statements.

Appellant's final complaint also fails. He asserts his counsel failed to object to questions the prosecutor asked William Brown, appellant's brother. The prosecutor asked Brown whether he was on drugs during the trial. She also asked both Brown and the other defense witness, Marcus Bruce, whether either had used drugs during the party on the night of the robbery. The prosecutor, it would appear,

asked these questions in good faith because Brown was incoherent at trial, and the description of the New Year's Eve party where a gun was fired supplied the required foundation for questions about the witnesses' capacities to perceive and recount accurately. *See United States v. Fowler,* 151 U.S.App.D.C. 79, 465 F.2d 664 (1972).

In sum, appellant has failed to make the showings mandated by *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). He has not demonstrated that his counsel committed errors so egregious that he was not functioning as the "counsel" guaranteed by the Constitution. Nor, given the government's strong identification evidence, has he shown that, but for such alleged errors, there is a reasonable probability that the outcome of the trial would have been different.

*Affirmed.*